**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| RETAIL WHOLESALE DEPARTMENT STORE UNION LOCAL 338 RETIREMENT FUND, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SYNCHRONY FINANCIAL, MARGARET M. KEANE, and BRIAN D. DOUBLES,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>DEMAND FOR JURY TRIAL<br><br>**ECF CASE** |

1. Plaintiff Retail Wholesale Department Store Union Local 338 Retirement Fund ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which included review and analysis of, among other things: (a) regulatory filings made by Synchrony Financial ("Synchrony" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c) analyst and media reports concerning Synchrony; and (d) other public information regarding the Company.

## I. INTRODUCTION

2. This federal securities class action is brought on behalf of purchasers of Synchrony common stock between October 21, 2016 and November 1, 2018, inclusive (the "Class Period"). The claims asserted herein are alleged against Synchrony and certain of the Company's senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

3. Synchrony is the largest provider of private-label credit cards in the United States. The Company provides a broad range of credit products through programs established with leading retailers. Specifically, Synchrony issues store-branded credit cards from retailers such as Lowe's, Walmart, Amazon, and The Gap, which promote Synchrony's credit products on the expectation of increased sales and strengthened customer loyalty.

4. As a private-label card provider, Synchrony's compliance with prudent underwriting policies is critical to its success. While Synchrony's retailer partners share in Synchrony's profits from proceeds collected from individual borrowers, Synchrony bears all the credit risk on the branded credit cards it issues. Moreover, Synchrony's store-branded credit card

business is focused on riskier borrowers. Private-label cards are generally easier to obtain than conventional bank-issued credit cards and, given the business demographics of its retail partners, these cards often attract a larger segment of higher-risk borrowers.

5. A decline in the credit quality of Synchrony's loan portfolio can have a significant impact on both Synchrony's balance sheet and stock price. Under Generally Accepted Accounting Principles and reporting standards required by the Financial Accounting Standards Board, the Company must set aside assets or reserve for probable loan losses. Moreover, as a regulated bank, Synchrony is subject to stringent capital, liquidity and leverage ratio requirements. If the credit quality of its portfolio deteriorates, Synchrony must increase provisions for loan losses, which offsets the Company's net income.

6. The claims asserted herein arise from Defendants' misrepresentations regarding the Company's underwriting practices and the impact that changes in underwriting were having on its private-label card business. At the beginning of the Class Period, Synchrony falsely represented that its "consistent" and "disciplined" underwriting practices and "focus on stronger underwriting" had led to "stable asset quality" and a "higher quality" loan portfolio than those of its competitors. In truth, Synchrony relaxed its underwriting standards and increasingly marketed, offered, and extended its private-label credit cards to riskier borrowers in order to sustain growth. Synchrony's undisclosed loosening of its underwriting standards resulted in the Company's loan portfolio presenting a greater credit risk than what investors were led to believe and a markedly higher likelihood of defaults, reserves and charge-offs. Defendants, however, failed to properly account for the Company's deteriorating loan portfolio. In particular, Synchrony set inadequate reserves for probable loan losses and overstated its net earnings.

7. The truth about Synchrony's credit standards and quality of its loan portfolio began to be revealed on April 28, 2017, when the Company announced disappointing first quarter 2017 earnings driven by poor loan performance. The Company disclosed that it would be setting aside over $1.3 billion in reserves to cover probable loan losses, a 21% increase in the reserves over the prior quarter. Synchrony also announced that its write-off rate climbed to 5.33%, the highest rate since at least 2012, and that it expected the write-off rate for the full year to be 5% or slightly higher, as compared to its earlier forecast of 4.75%. These revelations caused Synchrony's shares to decline by $5.25 per share, or nearly 16% – the Company's worst day of trading since its shares began trading in 2014.

8. Following these disclosures, the Company represented that it had "tightened" credit standards. Synchrony stated that tightening underwriting policies would prevent future charge-offs and free up significant capital the Company had reserved to cover probable loan losses. However, the Company falsely characterized these underwriting changes as "modest" and "surgical" in nature, when in fact the Company had made significant modifications to its underwriting and credit extension policies, including changing its new account acquisition strategies, tightening up credit line increases, and decreasing existing credit lines. In addition, the Company concealed from investors that its shift to more conservative underwriting practices – *i.e.*, the "disciplined" approach that it told investors it followed throughout the Class Period – was damaging relations with its retail partners.

9. Specifically, Synchrony's tightening of its credit approval and extensions placed its partnership with Walmart, Synchrony's most significant store-branded credit card program, in danger. The Walmart credit program, which dated back nearly 20 years, was the Company's highest revenue-producing account, generating more than $10 billion in annual loan receivables

and 19% of Synchrony's overall retail card balances. Unknown to investors, throughout 2017, Walmart officials complained to Synchrony executives that the Company's new credit restrictions were suppressing sales growth by denying too many applicants. Walmart also complained that the existing contract allowed Synchrony to keep too much card revenue. These executive-level discussions included a meeting in 2017 where Walmart executives complained directly to the Synchrony Board.

10. Despite being told privately by Walmart of its dissatisfaction with the new underwriting standards and existing retail share arrangement, Synchrony and its Chief Executive Officer ("CEO") falsely stated that the Company was "not getting any pushback on credit" from its partners. In fact, Synchrony and its CEO stated that its partners supported the underwriting changes since "they don't want to put credit in the hands of people that can't handle it" and because of the revenue sharing arrangements between the companies. The Company also misrepresented its relationship with Walmart, stating it had "a good relationship" and "great partnership" with Walmart, had a "great dialogue going on," and that the Company was "very confident" that it would secure Walmart's renewal.

11. The truth about the impact that Synchrony's changes in underwriting were having on its private-label card business began to emerge on July 12, 2018, when it was reported that Walmart was considering ending its relationship with Synchrony. Two weeks later, on July 26, 2018, multiple news outlets confirmed that Walmart had chosen a competitor to replace Synchrony. Together, these two disclosures caused Synchrony's shares to decline nearly 14%.

12. Then, on November 1, 2018, Walmart sued Synchrony alleging that the Company deliberately underwrote the Walmart/Synchrony credit card program in a way that exposes the program to significant unique credit risk. Walmart is seeking damages "in an amount . . . estimated

to be no less than $800 million." As a result of this disclosure, Synchrony shares declined by over 10%.

## II. JURISDICTION AND VENUE

13. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Synchrony maintains its corporate headquarters in Stamford, Connecticut, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

15. Plaintiff Retail Wholesale Department Store Union Local 338 Retirement Fund is a multi-employer pension fund that provides retirement benefits to retirees in a variety of industries, including retail supermarkets, pharmacies, healthcare facilities, maintenance facilities, as well as school monitors and bus drivers. Plaintiff purchased shares of Synchrony stock on the New York Stock Exchange ("NYSE") during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

16. Defendant Synchrony is a consumer financial services company. Incorporated in Delaware, the Company maintains its corporate headquarters at 777 Long Ridge Road, Stamford, Connecticut. Synchrony stock trades on NYSE, which is an efficient market, under ticker symbol "SYF." As of August 22, 2018, Synchrony had over 740 million shares of stock outstanding, owned by at least hundreds or thousands of investors.

17. Defendant Margaret M. Keane ("Keane") is, and was at all relevant times, CEO and President of Synchrony, as well as a member of the Company's Board of Directors (the "Board").

18. Defendant Brian D. Doubles ("Doubles") is, and was at all relevant times, Chief Financial Officer ("CFO") and Executive Vice President of Synchrony.

19. Defendants Keane and Doubles are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with Synchrony, possessed the power and authority to control the contents of Synchrony's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV. BACKGROUND

20. Based in Stamford, Connecticut, Synchrony is the fifth largest U.S. credit card issuer and the leading provider of private-label credit cards. The Company partners with retailers and manufacturers in issuing store-branded credit cards intended for use at a specific store or store

website. Synchrony's Retail Card segment, the Company's business unit responsible for its store-branded cards, traditionally accounts for nearly 75% of Synchrony's total annual revenue.

21. Synchrony's partners include retail giants like Amazon, Lowe's, The Gap, BP, J.C. Penney and Ashley Furniture. Retailers enter into these arrangements to increase sales and encourage customer loyalty. Synchrony's Retail Card program agreements typically contain retailer share arrangements (RSAs) that also provide for payments to the retail partner if the economic performance of the program exceeds a contractually-defined threshold.

22. Walmart, the nation's largest retailer, had for years been Synchrony's most important retail partner. Underscoring the importance of the relationship, Synchrony maintains a separate strategic partnership with Walmart subsidiary Sam's Club, which also ranks among Synchrony's five largest retail credit programs, bringing in over $8 billion in annual loan receivables.

23. Sound credit and risk management practices are critical components of the Company's management and growth strategy and are of upmost importance to Synchrony investors. Given the Company's roster of discount retailer partners, Synchrony's customer base is tilted toward the lower-income, higher risk borrowers. Over 25% of Synchrony's credit card loans are issued to borrowers with FICO scores of 660 or less. Subprime borrowers typically have lower incomes, worse credit histories, and represent a higher risk of loss than prime and near-prime borrowers. This risk is compounded by the fact that with consumer credit loans, there is rarely any collateral to protect the company from losses. Moreover, a decline in credit quality in Synchrony's portfolio can have a material effect on the Company's equity base. Synchrony leverages its balance sheets, and therefore a modest increase in losses can have a meaningful impact on the Company's capital position and stock price.

## V. SYNCHRONY MISREPESENTS ITS UNDERWRITING PRACTICES

24. The Class Period starts on October 21, 2016, when Synchrony announced its financial results for the fiscal third quarter of fiscal year 2016 ending September 30, 2016. In its press release, which was also filed with the SEC on Form 8-K, the Company reported provision for loan losses of $986 million and net earnings of $604 million, a 5.2% year-over-year increase in the Company's net earnings. That same day, Synchrony held an earnings call with analysts and investors during which Defendant Keane touted the Company's net earnings and net interest income growth. On the same call, Defendant Doubles promoted the Company's "significant growth opportunities," highlighting that "the credit environment remains favorable." Defendant Doubles further attributed the Company's growth to "consumers [] spending more, they're seeing real value on our cards," concluding that "we feel really good about overall, the fundamentals that we're seeing in growth."

25. On October 27, 2016, Synchrony filed its Form 10-Q for the third quarter of 2016, which repeated the Company's purported financial results and promoted the "stable asset quality" of the Company's loan portfolio.

26. On November 3, 2016, Synchrony presented at the BancAnalysts Association of Boston Conference. As part of the presentation, Defendants displayed slides emphasizing that since at least the third quarter of 2010 through the third quarter of 2016, the Company had "Focus[ed] on a Higher Quality Asset Base" and maintained "Disciplined Underwriting" which Defendants told investors "led to higher quality portfolio."

27. On January 20, 2017, Synchrony reported its financial results for the fiscal fourth quarter of fiscal year 2016 ending December 31, 2016. In its press release, which was also filed with the SEC on Form 8-K, the Company stated it reported provision for loan losses of $1.076 billion and net earnings of $576 million.

28. On January 30, 2017, Synchrony issued an investors' presentation entitled "2016 Fourth Quarter Investor Presentation," which the Company filed with the SEC on Form 8-K. In the presentation, Defendants represented that since at least the fourth quarter of fiscal year 2010 through the fourth quarter of fiscal year 2016, the Company had "Focus[ed] on a Higher Quality Asset Base" and had maintained "Disciplined Underwriting" throughout this period, which Defendants stated had "led to higher quality portfolio."

29. On February 23, 2017, Synchrony filed with the SEC its annual report for the year ended December 31, 2016 on Form 10-K. In the annual report, Synchrony reported an allowance for loan losses of $4.344 billion and net earnings of $2.251 billion for fiscal year 2016, an annual increase in net earnings of 1.7%. Synchrony emphasized the Company's "[s]table asset quality" and noted that "[t]he credit environment remained favorable during 2016." In the 2016 annual report, the Company affirmed that it complied with critical accounting estimates in preparing its consolidated and combined financial statements, including in establishing allowance for loan losses, which requires the Company to make its best estimate of probable losses inherent in the portfolio. Synchrony further confirmed that it periodically updated the underlying assumptions, estimates and assessments it used to provide for loan losses to reflect the Company's view of current conditions.

30. On February 27, 2017, Synchrony presented at the KBW Cards, Payments & Financial Technology Symposium. During the conference, Defendant Doubles stressed the importance of Synchrony's "very consistent" underwriting guidelines, and reiterated that the Company had not changed its underwriting "significantly over the past 9 to 12 months":

> So what's really important is rather than taking your underwriting guidelines up and down quarter to quarter or year to year, is to be very consistent so that your retailers know what to expect from you. And that just creates a better partnership. When, in 2014 and 2015, losses are at historic lows, we didn't take that opportunity to go a lot deeper. When losses

> started to normalize, we don't dramatically pull back. We haven't really changed our underwriting significantly over the past 9 to 12 months, either. So I think that consistency point is really important for us.

31. On April 4, 2017, Synchrony filed with the SEC its 2017 Proxy Statement on Form DEF 14A. As part of the Company's 2016 "Performance Highlights," Synchrony represented that it had achieved net earnings of $2.251 billion during the fiscal year, while "maintain[ing] stable credit metrics" and "remain[ing] disciplined on underwriting."

32. The statements and omissions set forth in ¶¶24-31 were materially false and misleading. In truth, Synchrony had not maintained consistent, disciplined underwriting practices and had not been focusing on a higher quality asset base throughout the period represented. In addition, Synchrony's loan portfolio was not of a "stable asset quality." Rather, to sustain loan receivable growth, Synchrony had loosened its underwriting guidelines and began approving and extending credit to riskier and less creditworthy borrowers. Synchrony knew that its relaxed underwriting practices had led to a marked deterioration in the credit quality of the Company's loan portfolios, and Synchrony anticipated significant charge-offs across the whole portfolio. As a result, Synchrony failed to set adequate reserves to properly account for probable losses in the Company's loan portfolio, and, in turn, overstated the Company's net earnings. Moreover, as detailed below, Synchrony had significantly changed its underwriting guidelines between mid-2016 and the beginning of 2017, which negatively impacted the Company's relationships with key retail partners, including Walmart.

## VI. THE COMPANY'S DISCLOSURE OF ITS DEFICIENT UNDERWRITING PRACTICES CAUSES SIGNIFICANT INVESTOR LOSSES

33. The truth about Synchrony's underwriting practices and their impact on Synchrony's loan portfolio and business was revealed on April 28, 2017, when the Company announced disappointing results for the first quarter of fiscal year 2017, including that net income

had dropped 14% from a year earlier. The Company attributed its performance to the poor credit profile of its loan portfolio. The Company revealed that net charge-offs had spiked to $974 million, leading to a charge-off rate of 5.33%, the highest Synchrony had reported since at least 2012. Moreover, CFO Doubles warned analysts that additional charge-offs were forthcoming. Specifically, the Company increased its loan loss reserve by $423 million to $1.3 billion, a 21% increase over the prior quarter. In addition, Defendant Doubles stated that the Company expected the write-off rate to remain at 5% or higher for the remainder of the year, as compared to the Company's earlier forecast of 4.75%.

34. Following the Company's announcement, market researchers and the media connected Synchrony's poor loan portfolio performance to its relaxed underwriting practices. Wells Fargo remarked, "Credit Rears Its Ugly Head Again." Wells Fargo Equity Research observed that "[c]ard losses don't stay at generational lows forever, but it is surprising that they are rising so rapidly." Similarly, Barclays stated that the "Disappointing Quarter on Big [Net Charge-Off] Miss Undermines Faith in [Synchrony's] Credit Guidance." JPMorgan summed up the market's sentiment by stating: "It will take time for investors to digest today's events and for management to restore confidence."

35. As a result of these disclosures, Synchrony's shares declined by $5.25 per share, or nearly 16%, from a closing price of $33.05 per share on April 27, 2017, to close at $27.80 per share on April 28, 2017.

## VII. SYNCHRONY'S FALSE STATEMENTS CONCERNING ITS RELATIONSHIPS WITH ITS RETAIL PARTNERS

36. Following the Company's disclosures on April 28, 2017, the Company admitted that in the second half of 2016, the Company had observed a deterioration in its 2015 and 2016 loan vintages, anticipated write-offs and consequently "tightened" its underwriting processes to

ensure better portfolio performance and avoid further write-offs. Nevertheless, Synchrony stated that these underwriting changes were "modest refinements," and "surgical" in nature. Moreover, the Company consistently assured investors that the underwriting changes were supported by the Company's retail partners, despite making less credit available to their customers.

37. For example, on April 28, 2017, Synchrony held a conference call with analysts and investors to discuss the Company's earnings for the first quarter 2017. During the call, Defendant Doubles reassured the market that Synchrony's underwriting model was not undergoing drastic changes, stating "we haven't made what I would call significant changes to our underwriting model to tighten up. The changes that we've been making, we'll continue to make, are pretty surgical in nature. They're specific to certain portfolios or certain credit strategies."

38. Similarly, on June 2, 2017, at the Sanford C. Bernstein Strategic Decision Conference, Defendant Doubles downplayed the significance of the Company's underwriting changes, stating "we did things very surgical, very targeted." Additionally, in response to an analyst's question regarding the state of competition in the industry, Defendant Keane stated: "Our whole business model is built around serving our partners," adding that Synchrony was "not afraid of the competition" and that "We have a good pipeline. We're winning the deals we want and feel good about the overall environment." Furthermore, in response to a question about "2 big partnerships up in 2019" and those customers potentially leaving Synchrony, Defendant Keane expressed that she was "confident" the Company would be able to keep the customers, stating: "My mantra right now inside the company is, right now, our partners need us now more than ever, and we have to be hitting the ball out of the park for them. So I feel confident we'll continue those relationships." Later in the call, Defendant Keane repeated to investors that "I feel pretty confident we'll be able to keep these relationships in our portfolio."

39. On July 21, 2017, Synchrony held a conference call to discuss the Company's earnings for the second quarter 2017. In response to a question regarding the progress of renewals for partner contracts expiring in 2019, Defendant Doubles stated "we feel pretty positive about the relationships that are coming up, the relationships we've had for a very, very long time" and was "confident that we'll be able to renew those relationships."

40. On October 20, 2017, Synchrony held a conference call to discuss the Company's earnings for the third quarter 2017. During the call, in response to an analyst's question regarding "large renewals out in 2019," Defendant Keane reiterated that the Company was "very confident that we'll be able to renew those relationships," adding that "I feel like we have very good relationships right now. Our partners need us probably more now than ever, given the transformation that's occurring in retail."

41. On November 14, 2017, at the Bank of America Merrill Lynch Future of Financials Conference, Defendant Doubles again tried to downplay the impact of the Company's change in underwriting standards, stating, "[t]hey weren't dramatic." In response to a question regarding how the Company handles the "natural tension" between retailers wanting Synchrony to extend credit to more customers and Synchrony wanting to tighten underwriting standards, Defendant Doubles assured investors that the Company's interests were "completely aligned" with the interests of their partners, stating, "I think that desire to stretch on credit and underwrite deeper is not there today to the same extent as it was pre-crisis. The other thing you have to remember is that the retailer share arrangement completely aligned our interest with our retail partners, right. . . . So they have a real incentive not to underwrite deeper as well. And I think that's something, again, we heard a lot about and was much more of a dialogue pre-crisis than it is today." Defendant Doubles further represented that Synchrony's customers "understand credit," "take a longer-term

view" regarding underwriting standards, and that Synchrony and its customers were "very much aligned in staying disciplined around underwriting."

42. On January 19, 2018, Synchrony held a conference call to discuss the Company's earnings for the fourth quarter 2017. During the call, Defendant Keane assured investors that the Company was "not getting any pushback" from its retail partners as a result of its admitted underwriting changes, stating, "I think our partners are very cognizant of the fact that they don't want to put credit in the hands of people that can't handle it, and we work very closely with them. In many cases, almost all cases, their names are on the cards. So we work very closely with them, and we are not getting any pushback on credit." Adding to Defendant Keane's response, Defendant Doubles stated, "these are modest refinements. These aren't wholesale changes to our underwriting strategy."

43. On April 20, 2018, Synchrony held a conference call to discuss the Company's earnings for the first quarter 2018. During the call, Defendant Doubles discussed the Company's underwriting changes, stating, "we started to make refinements to our underwriting in the second half of 2016, and we continue to see the positive impact of those changes." Additionally, in response to a question regarding "big renewals" in 2019, Defendant Keane responded that Synchrony was "well entrenched" with its partners.

44. On May 31, 2018, at the Sanford C. Bernstein Strategic Decisions Conference, in response to a question regarding renewals, Defendant Keane stated: "So I think, one of the things that gives us confidence is the fact that we have very long-term relationships," adding that "We work very closely with our partners as renewals are coming up" and "we feel good about where we're positioned competitively right now."

45. On June 13, 2018, at the Morgan Stanley Financials Conference, in response to a question regarding Synchrony's relationship with Amazon, Defendant Keane stated: "We have a good partnership. . . . I think we have good – Walmart is a good partner." Furthermore, in response to question about renewals, Defendant Keane stated: "I'm not afraid by our competition. I think we feel pretty positive about how we built out what we built out," adding "With the renewals that we're working on, we have great partnerships, great dialogue going on."

46. The statements and omissions set forth in ¶¶36-45 were materially false and misleading. In truth, the Company had made significant modifications to the Company's underwriting practices, including changing its new account acquisition strategies, tightening up credit line increases, and decreasing existing credit lines. In addition, the Company knew that its key retail partners, including Walmart, were dissatisfied with the Company's underwriting changes and that this had damaged their relationships with key retail partners. In particular, throughout 2017, Walmart officials had privately complained to Synchrony's executives, including its Board, that the Company was restricting sales by rejecting too many applicants and that Synchrony was keeping too much of the card revenues. Moreover, the Company knew that as a result of these underwriting changes, its partnership with Walmart was in jeopardy as Defendants knew that Walmart was in active discussions with its competitor, Capital One, to replace Synchrony as its exclusive branded credit card issuer.

## VIII. THE TRUE SCOPE OF SYNCHRONY'S UNDERWRITING CHANGES AND THEIR IMPACT ON THE COMPANY'S RELATIONSHIPS WITH ITS RETAIL PARTNERS IS REVEALED

47. On July 12, 2018, multiple media sources reported that Walmart was considering moving its branded credit card business from Synchrony to Capital One. Citing confidential sources, *The Wall Street Journal* stated that Walmart was dissatisfied with the Company because it "want[ed] Synchrony to approve a higher percentage of applicants," that Walmart executives

believed that Synchrony "is keeping too much of the cards' revenue," and the executives "aired those concerns in a meeting with Synchrony's board last year." On this news, Synchrony's stock fell $1.84, or 5.3%, from a closing price of $34.80 on July 11, 2018, to close at $32.96 on July 12, 2018.

48. Then, on July 26, 2018, several media outlets reported that Walmart had selected Capital One for its store-brand cards, ending its 20-year relationship with Synchrony. Thereafter, Jeffries produced a report projecting that Synchrony's annual profit may drop 12% with the loss of the Walmart account. On these disclosures, Synchrony stock fell $3.44 per share, or 10.3%, from a closing price of $33.44 on July 25, 2018, to a closing price of $30.00 on July 26, 2018.

49. On November 1, 2018, Walmart filed a lawsuit against Synchrony in federal court in Arkansas alleging that the Company intentionally underwrote the Walmart/Synchrony credit card program in a way that exposes the program to significant unique credit risk and harmed Walmart. The complaint states that Walmart is seeking damages "in an amount . . . estimated to be no less than $800 million." As a result of this disclosure, Synchrony shares declined by over 10%.

## IX. LOSS CAUSATION

50. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Synchrony stock and operated as a fraud or deceit on the Class (as defined below). Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on April 28, 2017, July 12, 2018, July 26, 2018, and November 1, 2018 the price of Synchrony stock fell. As a result of their purchases of Synchrony stock during the Class Period, Plaintiff and other members of the Class suffered harm.

## X. CLASS ACTION ALLEGATIONS

51. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Synchrony stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Synchrony and their families and affiliates.

52. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Synchrony has approximately 740 million shares of stock outstanding, owned by at least hundreds or thousands of investors.

53. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether Defendants violated the Exchange Act;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e) Whether Defendants' misconduct impacted the price of Synchrony stock;

(f) Whether Defendants' conduct caused the members of the Class to sustain harm; and

(g) The extent of harm sustained by Class members and the appropriate measure of harm.

54. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained harm from Defendants' wrongful conduct.

55. Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

56. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XI. INAPPLICABILITY OF STATUTORY SAFE HARBOR

57. Synchrony's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

58. Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Synchrony who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XII. PRESUMPTION OF RELIANCE

59. At all relevant times, the market for Synchrony stock was an efficient market for the following reasons, among others:

(a) Synchrony stock met the requirements for listing, and was listed and actively traded on NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Synchrony filed periodic public reports with the SEC and NYSE;

(c) Synchrony regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Synchrony was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

60. As a result of the foregoing, the market for Synchrony stock promptly digested current information regarding Synchrony from all publicly available sources and reflected such information in the price of Synchrony stock. Under these circumstances, all purchasers of Synchrony stock during the Class Period suffered similar injury through their purchase of Synchrony stock at artificially inflated prices and the presumption of reliance applies.

61. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Synchrony's reserves, net earnings, and Synchrony's Retail Card segment – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have

considered them important in making investment decisions. Given the importance of the Synchrony's private-label card business, as set forth above, that requirement is satisfied here.

## COUNT I

### For Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5 Against All Defendants

62. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

63. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause economic harm to Plaintiff and other members of the Class.

64. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

65. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

66. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

67. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Synchrony's true condition from the investing public and to support the artificially inflated prices of the Company's stock.

68. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased Synchrony stock and were harmed when the truth about Synchrony negatively impacted the price of those securities. Plaintiff and the Class would not have purchased Synchrony stock at the prices they paid, or at all, had they been aware of the truth about Synchrony.

69. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered harm in connection with their respective purchases of the Company's stock during the Class Period.

70. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

## For Violation Of Section 20(a) Of The Exchange Act Against The Individual Defendants

71. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

72. The Individual Defendants acted as controlling persons of Synchrony within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Synchrony, the Individual Defendants had the power and ability to control the actions of Synchrony and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensation to Plaintiff and other Class members against all Defendants, jointly and severally, for all harm sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XIV. JURY DEMAND

Plaintiff demands a trial by jury.

Dated: November 2, 2018

Respectfully submitted,

RETAIL WHOLESALE DEPARTMENT STORE UNION LOCAL 338 RETIREMENT FUND, BY THEIR ATTORNEYS,

*/s/ William H. Narwold*

William H. Narwold (ct 00133)
Mathew P. Jasinski (ct 27520)
**MOTLEY RICE LLC**
20 Church Street, 17th Floor
Hartford, Connecticut 06103
Telephone: (860) 882-1681
Facsimile: (860) 882-1682
bnarwold@motleyrice.com
mjasinski@motleyrice.com

*Liaison Counsel*

Avi Josefson (*pro hac vice* forthcoming)
Scott R. Foglietta (*pro hac vice* forthcoming)
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
avi@blbglaw.com
scott.foglietta@blbglaw.com

*Counsel for Plaintiff*

**CERTIFICATION PURSUANT TO**
**<u>THE FEDERAL SECURITIES LAWS</u>**

I, John R. Durso, on behalf of the Retail Wholesale Department Store Union Local 338 Retirement Fund ("Local 338"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Chairman of Local 338. I have reviewed the complaint and authorize its filing.

2. Local 338 did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Local 338 is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Local 338's transactions in the Synchrony Financial securities that are the subject of this action are set forth in the chart attached hereto.

5. Local 338 has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motions for lead plaintiff or was not appointed lead plaintiff:

   *In re PTC Therapeutics, Inc. Securities Litigation*, No. 16-cv-1224 (D.N.J.)
   *In re Solar City Corporation Securities Litigation*, No. 16-cv-4686 (N.D. Cal.)

6. Local 338 is currently seeking to serve as a lead plaintiff and representative party on behalf of a class in the following action filed under the federal securities laws during the three years preceding the date of this Certification:

   *Wigginton v. Advance Auto Parts, Inc.*, No. 18-cv-212 (D. Del.)

7. Local 338 has served as a representative party on behalf of a class in the following action filed under the federal securities laws during the three years preceding the date of this Certification:

   *In re PTC Therapeutics, Inc. Securities Litigation*, No. 16-cv-1224 (D.N.J.)

8. Local 338 will not accept any payment for serving as a representative party on behalf of the Class beyond Local 338's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2 day of November, 2018.

John R. Durso
Chairman
*Retail Wholesale Department Store Union Local 338 Retirement Fund*

**Local 338**
**Transactions in Synchrony Financial**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 11/30/2016 | 2,355 | 34.4897 |
| Purchase | 1/11/2017 | 5,777 | 36.2231 |
| Purchase | 1/17/2017 | 4,136 | 35.4579 |
| Purchase | 1/20/2017 | 8,460 | 36.2043 |
| Purchase | 2/15/2017 | 2,862 | 37.4446 |
| Purchase | 2/28/2017 | 3,029 | 35.7771 |
| Purchase | 4/28/2017 | 4,575 | 27.7359 |
| Purchase | 5/2/2017 | 3,563 | 28.1460 |
| Purchase | 5/19/2017 | 2,916 | 27.1896 |
| Purchase | 5/17/2018 | 12,016 | 34.8865 |
| Purchase | 9/4/2018 | 15,169 | 31.8578 |
| | | | |
| Sale | 1/19/2017 | (1,050) | 35.8300 |
| Sale | 2/15/2017 | (3,290) | 37.3700 |
| Sale | 4/19/2017 | (1,336) | 33.0000 |
| Sale | 4/27/2017 | (1,215) | 33.1574 |
| Sale | 6/21/2017 | (1,259) | 29.7000 |
| Sale | 7/20/2017 | (4,002) | 29.4267 |
| Sale | 9/18/2017 | (3,150) | 29.1845 |
| Sale | 10/2/2017 | (41,830) | 31.3300 |
| Sale | 2/20/2018 | (1,152) | 36.5437 |
| Sale | 4/23/2018 | (235) | 35.0000 |
| Sale | 7/9/2018 | (325) | 34.8600 |
| Sale | 8/24/2018 | (427) | 31.3500 |
| Sale | 9/20/2018 | (3,669) | 33.6514 |
| Sale | 9/24/2018 | (665) | 33.0400 |
| Sale | 10/24/2018 | (379) | 29.5020 |